# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| JTH TAX, LLC d/b/a LIBERTY TAX SERVICE, <br> 2387 Liberty Way <br> Virginia Beach, Virginia 23456 <br><br> Plaintiff, <br> v. <br><br> ROBERT BIGGS, <br> 308 General Marshall St. NE, Apt. 4 <br> Albuquerque, New Mexico 87123 <br><br> Defendant. | Civil Case No.: 2:21-cv-00064 <br><br> **VERIFIED COMPLAINT** |

**PLAINTIFF'S VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff JTH Tax LLC d/b/a Liberty Tax Service f/k/a JTH Tax, Inc. ("Liberty" or "Plaintiff"), by and through undersigned counsel, alleges for its Verified Complaint against Defendant Robert Biggs ("Defendant") as follows:

## INTRODUCTION

1. Defendant has breached his agreements with Plaintiff in an effort to circumvent and avoid the post-termination obligation provisions set forth in Defendant's Liberty Tax Service® Franchise Agreement and Mutual Termination Agreement. Defendant was the sole owner of one (1) Liberty Tax Service® franchise territory (the "Territory"). After the termination of the Franchise Agreement and execution of the Mutual Termination Agreement, Defendant continued to contact Liberty customers, utilizing the same customer lists and proprietary information of Liberty in furtherance of his new business ventures.

2. Defendant is using Liberty's trade secrets, customer lists, customer email

1

addresses, and other confidential information to call upon and solicit Liberty's customers in the operation of Defendant's new insurance businesses in violation of the post-termination provisions of the Franchise Agreement, Mutual Termination Agreement, and Virginia state law.  Liberty seeks (1) an injunction prohibiting Defendant from using Liberty's customer lists, (2) an injunction requiring Defendant to comply with the post-termination obligations under the Mutual Termination Agreement, and (3) $81,571.31 in debt that is due and owing in light of Defendant's breaches of the Mutual Termination Agreement.

## PARTIES

3. Plaintiff Liberty is a Delaware limited liability company with its principal place of business at 2387 Liberty Way, Virginia Beach, Virginia 23456.

4. Defendant is a citizen of the State of New Mexico, with a last known residential and business address of 308 General Marshall St. NE, Apartment 4, Albuquerque, New Mexico 87123.

## JURISDICTION AND VENUE

5. This Court has personal jurisdiction over Defendant because he entered into a valid and enforceable franchise agreement for the ownership and/or operation of a Liberty franchise territory (attached hereto as **Exhibit A** (the "Franchise Agreement") and a mutual termination agreement to terminate the ownership of that territory (the "Mutual Termination Agreement") (attached hereto as **Exhibit B**).  Defendant entered into a promissory note in favor of Liberty (the "Note") (attached hereto as **Exhibit C**).  The Franchise Agreement, Mutual Termination Agreement, and Note contain a mandatory forum selection clause whereby Defendant consented to the personal jurisdiction of this Court.  Exs. A § 17(b); B § 15; C at p.3.  The Franchise Agreement, Mutual Termination Agreement, and Note contain a mandatory choice of law

provision whereby Defendant agreed that "Virginia law governs all claims that in any way relate to or arise out of this Agreement or any of the dealings of the parties hereto." Exs. A § 17(a); B § 14; C at p.3.

6. This Court has original (federal question) subject matter jurisdiction over this claim pursuant to the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836, *et seq.*, as well as supplemental jurisdiction over the state claims pursuant to 28 U.S.C. § 1367 because they form part of the same case or controversy as the claims under the DTSA.

7. This Court also has subject matter jurisdiction over Liberty's claims pursuant to 28 U.S.C. § 1332 because complete diversity of citizenship exists between Liberty and Defendant. Liberty's members, proceeding up the membership chart to individuals and an incorporated entity, are individuals who are citizens of the states of Colorado, Connecticut, Florida, Illinois, Massachusetts, New Hampshire, New York, Pennsylvania, and Texas, and the Franchise Group, Inc., a Delaware corporation with its principal place of business at 2387 Liberty Way, Virginia Beach, Virginia 23456. Defendant is a citizen of New Mexico. The amount in controversy is over $75,000.

8. This action is properly venued in the Eastern District Court of Virginia pursuant to 28 U.S.C. §§ 1391(a)(1) and (2) because a substantial part of the events or omissions giving rise to the claims occurred within the Eastern District of Virginia, Norfolk Division, and because Defendant consented to this venue. Exs. A § 17(b); B § 15; C at p.3.

## FACTUAL BACKGROUND

**Liberty's Franchise System**

9. Liberty is the franchisor of Liberty Tax Service® income tax preparation service centers located throughout the United States, including the State of New Mexico.

3

10. Liberty owns the federally-registered Liberty Tax Service® trademarks, service marks, logos and derivations thereof (the "Marks"), and has spent substantial time and money advertising and promoting the distinctive and well-known Liberty Tax Service® system, which sells income tax preparation and filing services and products to the public under the Marks. Franchisees license the Marks pursuant to franchise agreements.

11. Pursuant to the terms of franchise agreements, Liberty discloses certain confidential information and trade secrets, including Liberty's confidential Operations Manual, methods of operation of franchise, customer information and records, and marketing information, to franchisees.

12. Liberty has grown to be one of the largest tax preparation franchises in the United States.

13. Liberty plays an important role in the local Virginia Beach, Virginia economy, as well as nation-wide, with a network of over 21,000 tax preparers.

14. Liberty's busiest time of year are the months of January through April, during which time Liberty generates approximately 90% of its annual revenue.

**Defendant's Obligations under the Franchise Agreement**

15. On or about July 5, 2018, Defendant entered into a franchise agreement with Liberty for the Territory known as NM008 (the "Franchise Agreement"). Defendant operated the NM008 Franchised Business from 1449 Eubank Blvd NE, Suite A, Albuquerque, NM 87112 (the "Franchise Location").

16. In exchange for Liberty's grant of a franchise allowing him to "operate a tax return preparation business using Liberty's system and Liberty's Marks within the Territory," and

4

specifically at the Franchised Businesses, Defendant agreed to certain obligations while operating under the Franchise Agreements, as well as post-termination.  *See generally* Ex. A.

17.     Pursuant to the Franchise Agreement, Liberty provided Defendant with training in franchise operation, marketing, advertising, sales, and business systems.  Defendant also received a copy of Liberty's confidential operating, marketing, and advertising materials, which are not available to the public or to anyone who is not part of Liberty's business system.

18.     Under the Franchise Agreements, Defendant agreed to pay Liberty certain royalties and fees.  Ex. A § 4(d).

19.     Section 9 of the Franchise Agreements sets forth Defendant's post-termination obligations, including the obligation to: (b) never hold himself out as a former Liberty franchisee and (g) deliver "any original and all copies, including electronic and cloud based copies and media, of lists and other sources of information containing the names, addresses, e-mail addresses, or phone numbers of customers of the Franchised Business".

20.     Pursuant to Section 10(f) of the Franchise Agreements, Defendant agreed "not to do any act that is, in Liberty's determination, harmful, prejudicial or injurious to Liberty or the Affiliated Companies, including their current and former employees, directors or agents."  *See* Ex. A.

21.     Pursuant to Section 10(h) of the Franchise Agreements, Defendant agreed, "that the provisions of Section 10 are reasonable, valid and not contrary to the public interest."  To that end, Defendant agreed to "waive all defenses to the strict enforcement of Section 10," and further agreed "Liberty is entitled to a temporary restraining order, preliminary and/or permanent injunction for any breach of duties under any of the non-monetary obligations of Sections 9 and 10."  *Id.*

5

22. Pursuant to Section 10(i) of the Franchise Agreement, Defendant agreed that "[t]he covenants contained in Section 10 shall survive any termination or expiration of this Agreement." *Id.*

23. Pursuant to Section 12 of the Franchise Agreement, Defendant acknowledged that information provided by Liberty to him regarding, among other things, Liberty's client contact information was confidential, and was to be used only in connection with the operation of the Franchise Location. *Id.* Pursuant to Sections 12(a) and (c) of the Franchise Agreement, Defendant agreed to refrain from using Liberty's client contact information, which constitute confidential information and trade secrets, for any other purpose following transfer, termination, expiration or nonrenewal of the Franchise Agreement.

**Defendant's Obligations under the Note**

24. Defendant entered into a promissory note in favor of Liberty on July 5, 2018 (the "Note") in the principal amount of $75,000. *See* Ex. C.

25. The Note provided for repayment by Defendant in Four installments of $18,750.00 plus accrued interest on February 28, 2019, 2020, 2021, and 2022. *Id.* at p. 1.

26. The Note provided that interest would accrue at a rate of 12% per annum. *Id.*

27. The Note provided that Liberty would deduct monies that Defendant owed Liberty to apply to upcoming amounts due to Liberty and remit the balance of fees received under Liberty's Automatic Payment Transfer program. *Id.*

28. In the Note, Defendant agreed, "to pay all attorneys' fees and other costs and expenses that Liberty may incur in connection with the collection or enforcement of [the Note]." *Id.*

29. Defendant agreed that the Note "shall be construed in all respects and enforced according to the laws of the Commonwealth of Virginia." *Id.*

**Defendant's Obligations under the Mutual Termination Agreement**

30. On or about July 30, 2020, Defendant and Liberty entered into a Mutual Termination Agreement for the NM008 Franchise Agreement. *See* Ex. B. In exchange for specified buy-out terms, Defendant agreed to comply with all post-termination obligations. *Id*. §§ 2(i), 6, and 7. Post-termination obligations include Sections 9 and 10 of the Franchise Agreement. *See* Ex. A.

31. As set forth in the Mutual Termination Agreement, Defendant had a debt of $81,571.31. *Id.* § 2.

32. Liberty agreed forgive Defendant's debt "strictly contingent upon: (i) [Defendant] complying with all post-termination obligations and (ii) the Target Revenue Stipulations defined [in Section 3]." *Id.*

33. Defendant agreed that if he failed to comply with all post-termination obligations, such failure rendered all amounts owed to Liberty immediately due and owing. *Id.*

**Defendant's Post-Termination Trade Secret Misappropriation and Breaches of the Franchise Agreement and Mutual Termination Agreement**

34. After entering into the Mutual Termination Agreement, Defendant began selling insurance policies.

35. Defendant retained a copy of Liberty's clients' contact information, specifically their personal email addresses, after the termination of his franchise.

36. Defendant used Liberty's clients' email addresses to solicit business for himself while referencing that he obtained their contact information from having done their taxes previously through Liberty, which caused client distress over Defendant's uninvited use of their personal email addresses.

37. On November 14, 2020, Defendant sent a mass email copying dozens of Liberty's clients for whom he had prepared taxes as a Liberty franchisee. By copying the recipients' email addresses, as opposed to separate emails or blind carbon copy, Defendant's disclosed Liberty's clients' email addresses to everyone else on the email thread.

38. Defendant's email informed the recipient that "you were a client of the Liberty Tax Service I owned on Eubank Blvd from 2010 to 2020." Defendant email went onto, without their permission or request, solicit Liberty's clients for his insurance business.

39. Several Liberty clients were upset by the uninvited solicitation to their personal email addresses and contacted Liberty to complain.

40. Defendant's uninvited use of Liberty's client contact information in breach of the Franchise Agreement and Mutual Termination Agreement has caused Liberty reputational damage and monetary damage.

## COUNT I
### *Breach of the Franchise Agreement and Mutual Termination Agreement*
### *(Equitable Claim)*

41. Liberty repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

42. The Franchise Agreements and Mutual Termination Agreement are valid and enforceable.

43. Liberty has performed every obligation and condition required under the Franchise Agreements and the Mutual Termination Agreement.

44. Pursuant to the Franchise Agreement, Defendant agreed (a) never hold himself out as a former Liberty franchisee, (b) deliver "any original and all copies, including electronic and cloud based copies and media, of lists and other sources of information containing the names, addresses, e-mail addresses, or phone numbers of customers of the Franchised Business", (c) "not

to do any act that is, in Liberty's determination, harmful, prejudicial or injurious to Liberty or the Affiliated Companies, including their current and former employees, directors or agents", and (d) not to use or disclose Liberty's Confidential Information, including client contact information for any purpose other than the business of the franchise. Ex. A §§ 9(b), (g), 10(f), 12.

45. Section 10 of the Franchise Agreement survives termination. *Id.* § 10(h).

46. On or about July 30, 2020, Defendant entered into a Mutual Termination Agreement as to the Franchise Agreement. Ex. B.

47. In exchange for specified buy-out terms, Defendant agreed to comply with all post-termination obligations. *Id*. §§ 2(i), 6, and 7.

48. Rather than comply with his post-termination obligations, on November 14, 2020, Defendant used Liberty's clients' personal email addresses to solicit them for his insurance business while referencing that he was a former Liberty franchisee.

49. Several Liberty clients were upset by the uninvited solicitation to their personal email addresses and contacted Liberty to complain.

50. Defendant has breached Sections 9(b), (g), 10, and 12 of the Franchise Agreements and Sections 2, 6, and 7 of the Mutual Termination Agreement.

51. Each of Defendant's foregoing breaches constitute a material breach of the Franchise Agreement and Mutual Termination Agreement.

52. Defendant's uninvited use of Liberty's client contact information in breach of the Franchise Agreement and Mutual Termination Agreement has directly and proximately caused Liberty reputational damage and monetary damage.

53. Liberty has been and will be irreparably harmed by Defendant's actions, and monetary damages are an insufficient remedy in that it can only potentially quantify a limited loss

of customers, but cannot take into account the continuing irreparable damage to the value of Liberty's Confidential Information, goodwill, customer loyalty, and its ability to sell franchises, all of which are caused by Defendant's violations.

54. Unless his wrongful conduct is enjoined, Defendant will continue to breach his obligations by continuing to breach the non-competition and non-solicitation covenants, continuing to use non-Liberty software on Franchised Business computers, and continuing to disclose and use Liberty's Confidential Information.

55. As set forth in the Mutual Termination Agreement, Defendant had a debt of $81,571.31. Ex. B § 2.

56. Liberty agreed to forgive Defendant's debt "strictly contingent upon: (i) [Defendant] complying with all post-termination obligations and (ii) the Target Revenue Stipulations defined [in Section 3]." *Id.*

57. Defendant agreed that if he failed to comply with all post-termination obligations, such failure rendered all amounts owed to Liberty immediately due and owing. *Id.*

58. Due to Defendant's failure to comply with the foregoing post-termination obligations, the debt of $81,571.31 is no longer forgiven and is immediately due and owing.

## COUNT II
### *Violation of Defend Trade Secrets Act of 2016*

59. Liberty repeats and re-alleges the foregoing paragraphs as if fully set forth herein.

60. The Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, provides a private civil action for the misappropriation of a trade secret that is related to a product or service used in, or intended for use in, interstate or foreign commerce.

61. Liberty owns numerous trade secrets, including but not limited to, its client lists and clients' contact information.

62. Liberty's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

63. Liberty's trade secrets are not readily ascertainable by the public as they are disclosed only to franchisees in the operation of a franchised business pursuant to a franchise agreement.

64. Franchisees are licensed to use the trade secrets only pursuant to the franchise agreements in the operation of a Liberty franchise to provide paid tax preparation and related services for customers.

65. During the operation of the franchise, Liberty's trade secrets were disclosed to Defendant for the sole purpose of operating the franchised businesses pursuant to the Franchise Agreement.

66. Liberty has taken extensive measures to preserve and protect these trade secrets for the purpose of maintaining their competitive advantage in the marketplace, including requiring franchisees to enter into a franchise agreement before disclosure, requiring franchisees to protect the trade secrets, and enforcing Liberty's interest in its trade secrets by initiating legal recourse against those who misappropriate its trade secrets.

67. Pursuant to Section 9(i) of the Franchise Agreements and Sections 2, 5, and 6 of the Mutual Termination Agreement, Defendant agreed that upon termination of the Franchise Agreement, he would never use, disclose, or permit the use or disclosure of Liberty's trade secrets in any manner whatsoever, and that he would return all copies of customer information upon termination.

68. Defendant not only failed to deliver to Liberty <u>all</u> copies of its trade secrets (customer lists and contact information), but Defendant <u>used</u> the trade secrets to secure a pecuniary benefit for himself.

69. On approximately November 14, 2020, Defendant sent an email to Liberty's clients soliciting their business for his new business venture in insurance.

70. Defendant intentionally and without Liberty's permission or authorization misappropriated and/or disclosed Liberty's trade secrets for his own economic benefit and with the intention and knowledge that his conduct would injure Liberty by causing Liberty's customers to become distressed and distrustful of Liberty's protection of its contact information.

71. As a direct and proximate result of Defendant's willful, improper, and unlawful disclosure and Defendants' willful, improper, and unlawful use of Liberty's trade secrets, Liberty has suffered and will continue to suffer irreparable injury.

72. Pursuant to 18 U.S.C. § 1836(b)(3)(A), Defendant's actual and threatened use and misappropriation of Liberty's trade secrets should be enjoined from further disclosure or use of Liberty's trade secrets.

73. Defendant's conduct in misappropriating Plaintiffs trade secrets was and continues to be willful and malicious - warranting an award of exemplary damages in accordance with 18 U.S.C. § 1836(b)(3)(C) and an award of reasonable attorneys' fees in accordance with 18 U.S.C. § 1836(b)(3)(D).

## **PRAYER FOR RELIEF**

WHEREFORE, Liberty prays for judgment against Defendant as follows:

1. For a permanent injunction enjoining Defendant from using any of Liberty's client lists or client contact information;

2. For a monetary award against Defendant in an amount to be proven at trial, but not less than $81,571.31;

3. For a monetary award against Defendant for Liberty's attorneys' fees and costs, in an amount to be proven at trial;

4. For pre- and post-judgment interest; and

5. For such other relief as the Court deems just and appropriate.

Dated: January 29, 2021                                  Respectfully submitted,

**GORDON REES SCULLY MANSUKHANI, LLP**

By: */s/ Julia K. Whitelock*
Julia K. Whitelock (VSB #79328)
1101 King Street, Suite 520
Alexandria, VA 22314
202.399.1009
202.800.2999 (Facsimile)
jwhitelock@grsm.com

*Attorneys for Plaintiff JTH Tax LLC d/b/a Liberty Tax Service*

## **VERIFICATION**

Timothy Magerle, being duly sworn, deposes and says:

I am Regional Director for JTH Tax LLC d/b/a Liberty Tax Service f/k/a JTH Tax, Inc. ("Liberty"). I read the foregoing Verified Complaint, know the contents thereof, and state the allegations are true and correct. I base this Verification on my own knowledge, except as to matters therein stated to be alleged upon information and belief, and as to those matters, I believe them to be true and correct. The grounds of my knowledge, information, and belief are derived from my position as Regional Director at Liberty, my personal involvement in the events underlying this litigation, and general investigation of the facts and circumstances described in the Verified Complaint, including, without limitation, my review of Liberty's records and conversations with Liberty's employees and franchisees.

DocuSigned by:
AEA79BF5D9E64BA...

Timothy Magerle
Regional Director for JTH Tax LLC d/b/a
Liberty Tax Service f/k/a JTH Tax, Inc.